## APPEALS OF TOXAWAY TANNING CO.

Docket Nos. 5084, 5694.   Decided November 9, 1926.

1. Petitioner was engaged in the business of tanning hides and producing finished leather. A number of years prior to the taxable years it constructed 322 tanning vats which, when completed, had a useful life of 50 years. *Held*, that the cost of constructing and tanning the vats was a capital expenditure and that such cost, less depreciation at 2 per cent per annum, should be included in invested capital for the taxable years.

2. The evidence submitted does not warrant the conclusion that petitioner is entitled to include in invested capital for the years 1917 and 1918 any amount with respect to the cost of tanning liquor in its vats at the beginning of these years.

3. Loss from fire determined.

*Charles D. Hamel, Esq., Albert L. Hopkins, Esq., L. Dana Latham, Esq.,* and *B. S. Womble, Esq.,* for the petitioner.
*John D. Foley, Esq.,* for the Commissioner.

These appeals involve deficiencies in income and profits taxes for 1917 and 1918 in the amounts of $21,029.93 and $81,334.62, respectively, arising from the Commissioner's reduction of officers' salaries voted and accrued for 1917, the failure of the Commissioner to restore and include in petitioner's invested capital for 1917 and 1918 the cost, less depreciation, of tanning 322 tanning vats constructed during the period from 1904 through 1914, the failure to include in invested capital for 1917 and 1918 the cost of tanning liquor in vats on December 31, 1917, and December 31, 1918, and the failure to allow the full amount of a loss from destruction and damage by fire in 1918 to certain of its capital assets.

FINDINGS OF FACT.

The petitioner, a North Carolina corporation, was organized in 1902 to engage in the business of tanning hides and selling finished leather. Its principal product was heavy bolting and sole leather. Its tannery was located at Rosman. Its selling organization maintains its headquarters in New York City and it has warehouses at New York, Boston and Chicago.

Prior to 1912, and from that date through 1919, the petitioner's officers were as follows:

Morris Dworetzky, president and sales manager.
Joseph S. Silversteen, vice president and general manager.
Joseph F. Schain, secretary.
Morris Osmansky, treasurer.
Joseph Rosenthal, assistant treasurer and assistant secretary.

Dworetzky had been in the leather business forty-five years. He had direct charge of all sales and exercised specific supervision over the New York and Boston selling department. He also had charge of the buying of raw hides and visited the tannery several times during each year. Silversteen was a practical tanner of more than thirty years' experience. He had full charge of the operations of the tannery and superintended the construction of all properties, tanning of the hides, the buying of tanning bark and the employment of labor. He also made frequent trips to New York in connection with the business. The other officers mentioned above had been with the company for more than fifteen years. They performed all duties incident to their respective offices and devoted their entire time thereto.

The petitioner voted and paid its officers' salaries for 1917 in the amount of $88,000, as follows:

| | |
|---|---:|
| Morris Dworetzky | $24,000 |
| Joseph S. Silversteen | 26,000 |
| Morris Osmansky | 14,000 |
| Joseph F. Schain | 12,000 |
| Joseph Rosenthal | 12,000 |
| | 88,000 |

The officers' salaries paid for the years 1914 to 1917, inclusive, were as follows:

| | |
|---|---:|
| 1914 | $110,000 |
| 1915 | 120,000 |
| 1916 | 128,000 |
| 1917 | 88,000 |

The earnings before payment of salaries for the years above stated were as follows:

| | |
|---|---|
| 1914 | $158, 416. 41 |
| 1915 | 209, 527. 95 |
| 1916 | 284, 720. 70 |
| 1917 | 153, 794. 68 |

During the year 1917 the petitioner paid a cash dividend of 40 per cent. Its sales during that year were in excess of $1,000,000. In addition it tanned hides and sold them for Swift & Co., on commission, in an amount in excess of $790,000. During the year 1917 it added to its surplus, after payment of officers' salaries and all other charges, $192,615.43. Its average interest-bearing indebtedness for 1917 was $407,000.

It had been the custom of the petitioner, from the time it was organized to and including 1917, to determine its officers' salaries for each year during the summer thereof. During July or August of each year, after the taking of the semi-annual inventory, the directors of the corporation met in New York and voted the officers their salaries for that year, but the resolutions fixing such salaries were not formally entered of record until the annual meeting of the stockholders and directors in February of the succeeding year. The amounts of salaries fixed in July or August were always entered on the books prior to the close of the books for that year, and the books were always closed prior to the annual directors' meeting at which the resolutions relating to salaries voted during the preceding summer were formally entered of record.

For 1918 and subsequent years, salaries voted for each year and the formal resolutions relating thereto were entered of record during the year. The change at that time was due to advice that income-tax procedure required formal record of the directors' action during the year of its occurrence.

Salaries voted for each year were customarily paid during the following year. This practice had its origin during the early years of the petitioner's existence and was based upon a desire to retain the funds for corporate use as long as possible. Salaries in the amount of $128,000, voted for 1916 in July of that year and recorded on the minute book at the annual directors' meeting February 6, 1917, were paid during the calendar year 1917. Salaries for 1917 in the amount of $88,000, voted in July, 1917, and formally recorded in the minute book at the annual directors' meeting February 7, 1918, were paid during 1918. The Commissioner allowed a deduction for officers' salaries for 1917 of only $12,000.

During the years 1917, 1918, and 1919, the petitioner had in operation 322 tanning vats. In the tanning process the raw hides were

placed in those vats and covered with a tanning liquor. In the construction of each vat an excavation of the proper size is first made in the ground, a box of brick-concrete walls is then constructed in the excavation and lined with pine timbers. The completed vat was 8 feet by 9 feet and 6 feet in depth. When the vat was completed the cracks were caulked with a Navy spun oakum.

Before the vat was ready for use it was necessary to tan the wooden lining in order to prevent it from withdrawing from the hides in process of tanning the liquor intended to tan the hides. The tanning of a vat preparatory to its use in the business was a standard process. Each vat was first filled with a tanning liquor of 30 degrees strength, prepared in a manner similar to the preparation of the liquor used for tanning the hides. In the course of a few days, one-fifth of the liquor with which the vat was filled was absorbed by the dry wooden lining. The vat was then refilled with liquor and so maintained for a period of from thirty to forty days until the wooden lining was completely saturated or tanned. The important element in this tanning liquor was the tannin. In the process an amount of liquor of 30 degrees strength, equivalent to $1\frac{1}{5}$ times the cubic contents of each vat, was used. Fifty per cent of the tannin in this 30 degrees solution was actually absorbed in the tanning process. Before the remaining liquor could be used for other purposes it had to be filtered and purified. In the process of purification one-half of the remaining liquor was lost. When the tanning process was completed the liquor was withdrawn, the vat thoroughly scraped and the cracks re-caulked. The vat was then ready for use for the tanning of hides.

The 322 vats in use during 1917, 1918, and 1919, were constructed as follows:

| Year. | Number of vats. |
|---|---|
| 1904 | 72 |
| 1907 | 106 |
| 1912 | 120 |
| 1914 | 24 |
| Total | 322 |

The cost of constructing these vats was charged to expense in the year of construction. The vat, when tanned as above described, has a useful life of at least 50 years.

The actual cost of tanning each vat can not be shown from the petitioner's books, due to the fact that the cost was merged with other expense items, but the amount of tannin used for tanning each vat, the market price per pound of such tannin at the dates of construction, and the labor required is readily determinable and was established by evidence. Each vat, being of standard size, had a cubic content of 432 cubic feet. Each cubic foot of this liquor weighed $64\frac{1}{3}$ pounds, or a total for each vat of 27,792 pounds of tanning

liquor. In the process of tanning each vat, one-fifth of the volume of the liquor was absorbed and the vat was re-filled, making a total of 33,350 pounds of tanning liquor used. Each pound of this tanning liquor contained 4½ per cent of tannin. The 33,350 pounds of liquor contained 1,500¾ pounds of tannin. Of this amount one-half was actually absorbed by the wooden lining. One-half of the balance was lost in the necessary process of purification. Each vat, therefore, required and used 1,125 pounds of tannin in the tanning process. The only item that varied was the cost per pound of the tannin and the labor. The total cost of tanning the 322 vats was $33,885.78. This cost included only items entering into the cost of actually tanning the vats, and was as follows:

### 1904.

| | |
|---|---:|
| 72 vats, 1,125 lbs. of tannin to the vat at 6 cents per lb. | $4,860.00 |
| Labor, re-caulking and cleansing at $5.75 per vat. | 414.00 |
| Total | 5,274.00 |

### 1907.

| | |
|---|---:|
| 106 vats, 1,125 lbs. of tannin to each vat at 8⅓ cents per lb. | 9,375.00 |
| Labor, re-caulking and cleansing each vat at $8.13 per vat. | 961.78 |
| Total | 10,236.78 |

### 1912.

| | |
|---|---:|
| 120 vats, 1,125 lbs. of tannin per vat at 10 cents per lb. | 13,500.00 |
| Labor, re-caulking and cleaning each vat at $10.60 per vat. | 1,207.20 |
| Total | 14,707.20 |

### 1914.

| | |
|---|---:|
| 24 vats, 1,125 lbs. of tannin per vat at 12½ cents per lb. | 3,375.00 |
| Labor, re-caulking and cleaning each vat at $12.20 per vat. | 292.80 |
| Total | 3,667.80 |

Before the raw hides could be placed in the vats for tanning, each vat had to be filled with liquor to a depth of 4½ feet. The strength of the liquor in the different vats varied according to the stage of the tanning process. In the process a certain amount of the tannin in the liquors was absorbed by the hides. It was necessary to replace the tannin absorbed so that the liquors were constantly maintained at their original strength. From the date of organization through the taxable years the petitioner charged to expense the cost not only of the original liquors with which the vats were filled but the cost of the additions necessary to maintain the liquors at their original strength.

The liquors in the 322 vats during 1917, 1918, and 1919 varied from 30 to 73 degrees, depending upon the particular stage of the tanning process. The average strength of the tanning liquors in all the vats was 46 degrees. Each vat contained 324 cubic feet of liquor. The weight of this liquor in each vat at 46 degrees was 22,168 pounds, and each vat contained 1,551.76 pounds of tannin. The cost of the liquors in the vats on December 31, 1916, was 13 cents per pound of tannin, or a total cost of $64,956.67. The cost of the liquors in the vats on December 31, 1917, was 13½ cents per pound of tannin, making the total cost $67,456.

The plant was practically destroyed by fire on October 11, 1918. The tanning liquors in all of the vats were completely destroyed. The cost thereof on October 11, 1918, at 14½ cents a pound, was $72,451. The petitioner received $19,706.54 in settlement from the insurance company for the tanning liquors destroyed. This entire amount was received in 1918 and was included in taxable income for that year.

A pump and ringer purchased during the year 1917, at a cost of $1,056.25, was destroyed by fire. The cost of this item was charged by the petitioner to expense. The Commissioner disallowed this deduction in 1917 and restored the cost to capital account. The amount received from the insurance company in 1918 on account of the destruction of this machinery was included by the petitioner in its income for that year. The useful life of the pump and ringer was 15 years.

On the date of the fire the petitioner had in its vats in process of tanning in excess of 36,000 hides, which had cost $641,565.77. This amount did not include any part of the tanning, manufacturing or selling costs. These hides were in various stages of tanning at the date of the fire. They were of a heavy grade, of high quality, and were intended when tanned for use for soles and belting. Such leather must have great tensile strength and must not be off color. The fire heated the hides and the tanning liquors in which they were submerged to a high temperature. The heat destroyed the gelatine which forms the core of each hide, with the result that the tanning liquor could not penetrate the hide and transfer it into finished leather. Particles of iron, a great amount of nails, and other foreign substances fell into the liquors during the fire and turned them black and the hides off color. Some of the hides were more seriously damaged than others, owing to the stage of process in tanning.

The petitioner was engaged at the time of the fire in the production of material contributing to the prosecution of the war. Quantity production was essential. It estimated the damage to its hides in process, in its claim to the insurance company, to be $300,000. It was impossible to determine at the time of the fire the exact amount of

the damage to the hides in process. The actual damage could only be determind after the tanning process had been completed and the hides disposed of or offered for sale. The petitioner did not carry insurance to the full value of the assets destroyed, and because of its failure to do so received but 58 cents on the dollar of damage determined by the insurance company to have been sustained. The insurance company determined the petitioner's damage to its hides in process to be $140,505.09. The petitioner received from the insurance company for damage to hides in process $84,185.23. The settlement was not satisfactory to the petitioner and was accepted only because of the pressing necessity of resuming its war production. The entire amount of this insurance was received during the year 1918 and was included in taxable income for that year.

The petitioner's closing inventory, December 31, 1918, for hides in process was reduced by the amount of $140,505.09, leaving a balance for the cost of raw hides in process of $501,151.68. The Commissioner allowed the petitioner a loss from damage to the hides in process occasioned by the fire of only $140,505.09.

Immediately after its settlement with the insurance company, the petitioner proceeded to rebuild its plant and complete the tanning of the hides in process. It was necessary to do this, as otherwise the hides would have been unusable and the loss total.

The damaged hides when tanned were sold during 1919 and years following. It was then that the extent of the damage was realized. The hides were off color, brittle, pocketed, and without their usual tensile strength. A portion was sold as low as 15 cents a pound at the time when undamaged hides were selling for as much as 75 cents a pound. The petitioner received for the damaged hides $560,874.07. Eliminating manufacturing cost, which was $212,-650.11, the petitioner received from the raw hides $348,223.96. The cost of the raw hides in process at the date of the fire was $641,-565.77. Deducting $348,223.96, the amount received for the hides, from the cost, the damage to hides in process from the fire would be $293,341.81. Of this loss, the Commissioner allowed $140,505.09. The petitioner is entitled to an additional deduction from income for 1918 for this loss of $152,836.72. The insurance of $84,185.23 need not be considered in determining this loss, since the entire amount thereof was included by the petitioner in its income for 1918.

OPINION.

LITTLETON: These appeals were consolidated for hearing and decision. The Commissioner in his answer objected to the jurisdiction of the Board with regard to the year 1917. On a statement of the facts involved the Commissioner's objection to the Board's

jurisdiction was overruled by the division hearing this case. That ruling is approved. The Commissioner's answer also set up a counter-claim for the year 1918, but such counter-claim was abandoned and no proof in support thereof was introduced.

The issues involved are as follows:

1. The disallowance for 1917 of all but $12,000 of $88,000 claimed for officers' salaries.

2. The failure to restore to and include in the invested capital for 1917 and 1918 the cost, less depreciation, of tanning 322 vats constructed in 1904, 1907, 1912, and 1914.

3. Failure to include in invested capital for the years 1917 and 1918 the cost on December 31, 1916, and December 31, 1917, respectively, of tanning liquors in vats on those dates.

4. Failure to allow the full amount of loss from the destruction and damage by fire in 1918 to certain capital assets.

5. The reduction of invested capital for 1917, 1918, and 1919, by the amount of prior years' income and profits taxes.

The first question is whether the petitioner is entitled to a deduction for 1917 for the full amount of the $88,000 officers' salaries voted and accrued during 1917 for that year. The record discloses that it had been the consistent policy of the directors for many years prior to 1917 to agree upon the officers' salaries for each year at a meeting held in New York during the summer of that year. At that meeting, which occurred immediately subsequent to the semi-annual inventory, after the profits for the first six months' operations had been determined, all of the officers and directors were present. Officers' salaries in the amount of $128,000 for 1916 were agreed upon in the summer of 1916. The same was true for prior years. The salaries voted during the summer of 1917 for that year were entered on the books of the company and credited to the officers' accounts before the close of that calendar year. This was also in accordance with the regular custom of the corporation. These salaries were corporate liabilities in 1917. Four of the five directors testified as to the action taken in regard to the salaries and the amounts agreed upon, and the record discloses that the salaries accrued for 1917 were decided upon and voted in July, 1917, although no minutes were made showing such action and no entries made on the books until the close of the year.

The question was raised as to whether the salaries of the officers for the year 1917 were reasonable. We believe from all of the evidence that this objection is not well taken. The sales for 1917 exceeded $1,000,000. In addition the petitioner tanned and sold raw hides on commission for Swift & Co. in an amount aggregating in excess of $790,000. During the same year it added to its surplus, after payment of officers' salaries and other charges, $192,615.43,

and paid its stockholders a cash dividend of 40 per cent. Each of the officers was actively engaged in the administration of the company's affairs during 1917 and from its organization in 1902. In our opinion the salaries for 1917 were reasonable and should be allowed. *The Parisian*, 2 B. T. A. 415.

The next question is whether invested capital for 1917 and 1918 should be increased by the cost, less depreciation, of tanning its 322 tanning vats. The tanning of the wooden lining of each of the vats was as essential as the lining itself. Hides could not be tanned until the lining itself had first been tanned. When the lining was once saturated with tannin the vat was ready for use and there was nothing further to be done. The lining had a useful life equal to that of the vat. Each vat when tanned had a useful life of at least 50 years. The Commissioner did not contend that this cost was not a capital expenditure. His objection was that the specific costs could not be definitely determined from the petitioner's books, that the cost of tanning the vats was charged to expense and included with other such items and for that reason it would be impossible to make a separation on the books of the petitioner.

The cost of tanning a vat was standard. The 322 vats were 8 feet by 9 feet by 6 feet in depth. Each vat had a content of 432 cubic feet and absorbed one-fifth of its cubical contents in the process of tanning. A liquor of 46 degrees strength was used in the process. Each cubic foot of this liquor weighed 64⅓ pounds. Four and one-half per cent in weight of each pound of this liquor was tannin. The total tannin required for each vat was 1,500¾ pounds; one-half of this amount was actually absorbed by the wooden lining; one-half of the remainder was lost in the necessary process of filtration and purification of the residue. The tanning of each vat, therefore, consumed 1,125 pounds of tannin. The cost of tannin per pound in 1904, 1907, 1912, and 1914 was disclosed by the petitioner's books. The dimensions of the vats and the cost per pound of tanning being given, it is but a mathematical process to determine the cost of tanning a vat. The cost of tanning the 322 tanning vats was $33,884.78. The useful life of each vat was 50 years. The proper deduction for depreciation was 2 per cent. The addition to petitioner's invested capital for 1917 and 1918 was cost, less depreciation at 2 per cent from the date of construction. The deduction for exhaustion, wear and tear of the vats for 1917 and 1918 should be computed at the rate of 2 per cent.

The third issue is whether the petitioner is entitled to include in its invested capital for 1917 the cost of tanning liquor in its vats at December 31, 1916, and for 1918 the cost of such liquor at December 31, 1917. Upon the construction of the vats and before the process of tanning hides could be commenced, it was necessary

to fill each vat with liquor to a depth of 4½ feet and constantly to maintain this liquor at an average strength of 46 degrees Barkometer. The cost of the original liquor placed in the 322 vats is not shown. In the process of tanning the hides, a portion of the tannin, which is the essential element, is absorbed from day to day, and additional tannin must be added to maintain the liquor at the required strength. The cost of the tannin fluctuates from time to time. It is contended that "the taxpayer's investment in tanning liquor is the cost of the original liquor plus all additions thereto to maintain the required strength, less the cost of the liquor actually absorbed by the hides," and that "it is clear therefore that on a given date all the liquor in the vats constitutes the capital item in question." The Board can not agree with this contention. It may be that the cost of the liquor with which the vats were originally filled was a capital expenditure, since the liquor was as essential as the vats or any other item of a major character, and since it was necessary to maintain the liquor throughout at a uniform strength, but the cost of tannin subsequently added from time to time during the year made necessary by the constant absorption thereof by the hides was an ordinary and necessary manufacturing expense within such year.

The method contended for by the petitioner would permit it to include in invested capital for the year the cost not only of the liquor originally placed in the vats, but also any increase in the cost of tannin used for replacement purposes, such increase in cost being deducted as an expense of manufacture.

We have no evidence as to the cost of the liquor with which the vats were originally filled, and it is not necessary therefore to consider whether any amount should be restored to invested capital on this account. It is our opinion that the Commissioner correctly denied the claim that the cost of the liquor in the vats on December 31, 1916, and December 31, 1917, should be included in invested capital for 1917 and 1918, respectively.

The fourth issue concerns the amount which the petitioner is entitled to deduct from income for 1918 as losses sustained by it from fire during that year. Its plant was destroyed by fire on October 11, 1918. The plant was partially covered by insurance and for every dollar of damage done, as determined by the insurance company, the petitioner received 58 cents. It was under-insured 42 per cent. At the time of the fire the petitioner was engaged in war production. The settlement with the insurance company was not satisfactory to the petitioner but was accepted in order that it might rebuild its plant and resume work. The entire amount of the insurance was received by the petitioner during the year 1918 and was included in taxable income for that year.

The tanning liquor in the vats on October 11, 1918, was completely destroyed by fire. The cost thereof, which had been charged to expense, was $74,451. The petitioner received in 1918 insurance of $19,706.54 for the destruction of this liquor and included the same in income for 1918 and claimed a loss of $72,451. The Commissioner declined to allow the deduction of any portion of the claimed loss.

For the reason stated in connection with the preceding issue relating to the capitalization of the cost of tanning liquor, it is the opinion of the Board that the Commissioner correctly denied the deduction of the cost of the liquor destroyed by fire as a loss sustained within the year. When the petitioner received $19,706.54 from the insurance company, it was in the same position as if it had incurred an expense for liquor of $54,744.46. The petitioner had already deducted from income, and we think properly, the cost of the liquor destroyed, and it may not again reduce its income by the same amount or in the amount of the difference between the insurance received and the cost of the liquor destroyed.

A pump ringer costing $1,056.25 was purchased by the petitioner in 1917, which cost was charged to expense during the year 1917. The deduction was disallowed by the Commissioner and the cost restored to capital. This article was totally destroyed by the fire. Some insurance was recovered but was included in income for 1918. The petitioner is entitled to a deduction from income for 1918 of the total cost of this article, amounting to $1,056.25, less one year's depreciation at 6⅔ per cent, since the useful life of the article was 15 years.

The petitioner had on hand at the date of the fire, in process of tanning, hides which had cost it $641,565.77. This amount did not include manufacturing or selling cost. The hides were badly damaged by heat and discolored as a result of pieces of iron, nails and other débris falling into the vats. The exact amount of the damage done could not be determined at that time. It was necessary to complete the tanning process and then dispose of the hides, if possible, in order definitely to determine the extent of the damage. As soon as the settlement was made with the insurance company, the tanning of the hides was resumed and was completed in 1919.

On December 31, 1918, petitioner reduced its inventory of hides in process by $140,505.09, leaving a net cost of hides in process of $501,151.68. This figure included the cost of the raw hides exclusive of the cost of manufacture. The total cost of tanning the hides damaged by the fire was $212,650.11, which was also carried in the inventory. The damaged hides were subsequently sold for $560,874.07. The Commissioner allowed $140,505.09 as a deduction from income for 1918 for damage to hides in process. From the evidence we are of opinion that the damage to hides in

process was $293,341.81. The petitioner is therefore entitled to a deduction from income for the year 1918 of this loss. The petitioner received from the insurance company on account of the damage $84,185.23. This was included in 1918 taxable income and need not be considered in determining the loss.

The fifth issue involved in this appeal is whether invested capital for the years 1917, 1918, and 1919 should be determined without reduction thereof on account of prior year's income and profits taxes. We approve the Commissioner's computation of invested capital in this regard. *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

> *Judgment will be entered on 15 days' notice, under Rule 50.*